Case No. 23-1736 Mackinac Ctr for Public Policy at All v. Miguel Cardona at All for arguments not to exceed 15 minutes per side Mr. Shang Li for the appellants May it please the court, Shang Li for appellants, the Mackinac Ctr and the Cato Institute I'm here with my colleague, Russell Ryan. I'd like to reserve three minutes for rebuttal, please. The issue in this case is whether an employer that receives an economic advantage under a congressional enacted program is injured when an executive agency, hereby counting non-payments oxymoronically as payments, reduces, shortens, or otherwise diminishes that advantage. The program at issue is the Public Service Loan Forgiveness Program. Under that, a borrower gets all of his or her student loans forgiven after making 120 monthly payments while working full-time for a qualified public service employer. Both appellants are qualified public service employers here. Defendants claim that PSLF, that's the program, doesn't benefit employers. But that is contradicted by defendants' own regulations, which recognize that Congress enacted this program and I quote from the regulations here, 34 CFR 685-219-A to encourage individuals to enter and continue in full-time public service employment. The promise of loan forgiveness after 10 years of payment and service provides a powerful financial incentive for borrowers to work for qualified public service employers over their competitors in the non-public service sector, private sector employers, for-profit employers. Specifically, who are the competitors for your clients that competitive standing applies to? Who are you competing with? Well, if you look at our clients' webpages with their scholars and staff, they hire lawyers, economists, communications folks. Those professions, there's a nationwide market for competition for those professions. Many of the current staff in Cato's attorneys, for instance, many of them used to work for for-profit big law firms. And there's a competition between non-profit employers like Cato and the Mackinac Center and for-profit employers and Congress explicitly recognized the existence. I don't see in the complaint where you, as you've laid out here, that you have attorneys that may be competing with private sector law firms and things of that nature. That doesn't seem to be spelled out in the complaint that you filed. Well, the complaint has a declaration from the heads of both appellants stating that they have employees and that these employees are, there exists a nationwide market in highly educated college employees, college educated employees who would have student loans. And those employees can enter the private sector, can enter the for-profit sector, or I'm sorry, public service sector or the private sector, and that competition exists. And the complaint lays out, you know, alleges this competition exists and at the motion to dismiss stage we're entitled to a favorable inference that there is in fact competition between public service employers and the for-profit employers in the private sector. If we look at the Southwest Pennsylvania case, which you rely on, in that case the manufacturers in Pennsylvania specifically pointed to the manufacturers in Ohio that were gaining this advantage by the EPA's changing the attainment designation. And I don't, you know, I'm having a difficult time seeing that here where you point to specific private employers that your clients are competing with that you have a disadvantage with. I think, Your Honor, the competition is with respect to kind of private employers in general. If we, I don't think we need to identify specific private employers. For example, you look at the Shirley case out of the D.C. Circuit. They're the researchers who are competing for the NIH grant funding. They didn't need to compete for, you know, identify, name other researchers who would otherwise be qualified. In fact, they didn't even need to identify the future NIH grants. They didn't know, you know, future grants that hadn't been announced yet. But by expanding the eligibility, that increased competition and thereby inflicted a competitive disadvantage. And here, we don't believe that the case law requires us to identify specific private employers that compete with us. And moreover, even if we did, the posture of this case, because the district court here dismissed sua sponte without giving us notice and the opportunity to amend the complaint, prevented us from even having the opportunity to amend the complaint and provide those details, even if that were necessary. What's your best case from the Sixth Circuit or the Supreme Court that you come into this and show that you have standing? Your Honor, as Justice Mathis mentioned, that's the Growth Alliance case out of the Sixth Circuit. I think it's the best on-point and precedentially binding case on this issue where all there was was an imaginary border between Ohio and Pennsylvania and the EPA designation created an economic advantage for the Ohio firms, which translated into an economic disadvantage for the Pennsylvania firms. The Pennsylvania firms did not have to allege, for example, that a particular customer, because of this change in environmental designation, didn't buy from them or they lost a particular item of sale or lost particular revenue. Nor did they need to trace the EPA's designation to any of those things. But what was important was that they could take the EPA's designation and connect that to the economic disadvantage. And there the economic disadvantage was lower operating costs for the firms on the other side of the border. Here, the economic disadvantage is the loss in PSLF incentives for borrowers in the situation. What do we do with the lack of detail as it relates to individuals that are working for your clients, participating in the particular program? I know your complaint says you have folks that you're trying to recruit, that have participated in the program, that used to work in the program, but where do we get the eminence as opposed to a potential future harm? Your Honor, both appellants here have a history of employing folks. That's in the declarations. They currently employ folks in the program, and there's every expectation that they'll be employing folks in the future. They're in no different position from the two researchers in Shirley who have a history of applying for grant applications and are currently applying, and they fully expect to apply for future grant applications. Now, the details of the program, because this particular program, the one-time adjustment, was announced through just a couple paragraphs in a one-page press release, we actually don't know exactly, precisely who is affected, which borrowers are affected. The press release says something more than 3.6 million people are affected. Doesn't that hurt your case?  You don't know who's affected? No, Your Honor, because in order to figure out who's affected and whether or not any of appellants' current employees are affected or any of appellants' future prospective employees are affected, we would actually have to know who these people are. And by not going through notice and comment, by not going through what the higher education requires for this sort of regulation, we were prevented from knowing that and being able to comment on it. So in addition to this competitive injury, we also have a procedural injury of not having notice and comment opportunities. And, Your Honor, I think maybe an example to highlight the lack of need to be so specific, as you might think, suppose Congress, in being concerned that top students at law schools were going to big cities to clerk, big coastal cities, and they enact a program that says if you clerk, if you're a top law student, you clerk in one of the interiors of the country, including the Sixth Circuit, you get your loans forgiven. It obviously benefits judges who are recruiting clerks in the Sixth Circuit and Seventh Circuit and Eighth Circuit in the middle of the country. And suppose after some number of years of this program, with more students coming into the interior of the country to clerk for judges there, the Department of Education says, you know what, the cost of living in coastal cities is too high, so we're going to forgive the student loans of clerks who clerk on the coast as well. Certainly, that would diminish the economic disadvantage and create an economic disadvantage for the judges in the interior of the country. The judges in the interior of the country, however, cannot necessarily point to specific students. That just wouldn't apply to them. They wouldn't know about the students that would never apply. Yet, it would be obvious that they are still suffering, one, an economic disadvantage vis-a-vis the recruiting of clerks, and a procedural injury on top of that for not having the opportunity to give notice and provide comments to the Department of Education's adjustment. But it seems like in that particular hypothetical, the disadvantage would be, the comparative disadvantage would be to the judges on the coast, so we can point to specific folks to say we have disadvantage with these particular people as opposed to every judge in the entire world or the entire country, which is sort of public sector, your clients versus the entire private sector. I think that's not necessary here, Your Honor, because the statute itself, by identifying and separating so discreetly the definition of what's a public service employer and by doing so what's who it's not, the statute, Congress has recognized the existence of competition between those two things. It would make no difference. It would make no sense for Congress to provide an economic benefit for a statutorily defined set of public service employers by encouraging borrowers to work for them if there was no competition between those employers and private sector firms. Now, Your Honor, again, we believe that there's no need to allege specific competitors here, which it would be like no difference whether you're competing with respect to a particular clerk for the Second Circuit versus the Ninth Circuit. We don't need to identify specific competitors. But even if that were necessary in the alternative, Your Honor, we should still reverse and remand for further proceedings so that we can at least amend the complaint to add those allegations. Well, I see I have a little more time, and I just want one point on the procedure injury aspect, that in the environmental context it's also, you know, we've talked mostly about competitive injury, but in the environmental context it's sufficient where a member of an organization goes out and says, you know, I have an aesthetic interest in monarch butterflies, longhorn beetles, whatever, and an agency action might injure the population of those things that makes it more difficult for me to see monarch butterflies or longhorn beetles. Here we have really the same thing. The agency action, you know, our clients have a specific interest in recruiting PSLF participants, and what the agency action here does is reduces the number of PSLF participants by prematurely canceling their loans. I see my time is up, and I will reserve the rest of it for rebuttal. Thank you. We'll have you for rebuttal. Thank you. Good morning, and may it please the Court. Thomas Pullum for the Appellees. Article 3 standing helps to ensure that the plaintiff has a personal stake in the outcome of a controversy. Here these two plaintiffs have no personal stake in the loan balance of student borrowers. They are not harmed when the Department of Education corrects failures in the administration of student loan programs to ensure that borrowers receive the loan forgiveness to which they are entitled. The plaintiffs say that they have competitor standing, but they are not in competition with student loan borrowers, and they have not cited any cases that recognize competitor standing to challenge a benefit conferred on a third party. Their inability to establish a concrete interest affected by the Department's action also prevents them from establishing procedural injury. The judgment should be affirmed. Well, your opponent suggests that there is a case here from the Sixth Circuit that would show that he has a right to proceed. What do you say about that? So I say that the kind of reasoning that the language that the plaintiffs latch onto in that case, this economic advantage language, we know that that can't be relied on to support standing because a Supreme Court case that followed the decision in the Growth Alliance case specifically said, rejected what it called a boundless theory of standing that a market participant is injured whenever a competitor benefits from something allegedly unlawful. So we know that that is not enough to create standing. In addition, the facts were quite different in that case. There was a government action that reduced regulatory burdens directly on a competitor. It wasn't a government action that affected third parties, not in competition with the plaintiffs. So what the plaintiffs here are asking for is for this court to seize onto language and a theory that the Supreme Court expressly rejected, and then to extend that theory beyond the facts of the original case. So for that reason, we think that their reliance there is misplaced. They also today mentioned the Shirley opinion. I think that's out of the D.C. Circuit that supports their argument. How do you distinguish this case from Shirley? So that falls within kind of the core heartland of competitor standing cases, which recognize that there is an injury when agencies lift regulatory restrictions on competitors or allow increased competition. There, there was a change to the grant program that allowed embryonic stem cell researchers to compete against adult stem cell researchers. So they were effectively allowing competition by people who couldn't compete before or allowing people to compete in a different way on studies that weren't permitted before. So that's really in the heartland, as I said, of what competitor standing, the role that it plays. The idea is that when there is an increase in competition in one of these ways, allowing new players into a regulated field or allowing players to do something they weren't allowed before, that that increases competition, and we know that increased competition will create an economic harm in terms of lost sales, reduced profits, that kind of thing. So it's in that specific type of situation where we are certain that increase in competition will lead to harm that we don't require the plaintiff to come forward with specific instances of lost sales or reduced profit. But there has to be an increase in competition. The cases are quite clear that this theory does not supply the link between the challenge behavior and the competition, and that's what's lacking here. We have a challenge behavior that does not increase competition. It's not obvious that it increases competition in the field, so they would need to provide that through their well-pleaded allegations, and they haven't done that here, and it kind of creates two problems. One, we don't have a certainly impending imminent injury, and two, we have a causation and redressability issue because any problem here is mitigated through the decisions of independent third parties. And the Supreme Court in Clapper, for example, said that this kind of third-party problem creates difficulties for both establishing imminent injury and causation. And their theory, if I might make one final point, is just really counterintuitive. They say that these borrowers, when they are given the loan forgiveness to which they're entitled after 10 years in service, that all of a sudden, when their loans are forgiven, that they are going to leave their established public service careers that they've had for at least 10 years and immediately run to the private sector to make more money. Normally, one would think that the debt obligation from student loans is what creates the pressure to make more money. So I think it's really counterintuitive that as soon as people no longer have loans, that that's when they all of a sudden need to rush to a higher salary. And when we have that kind of counterintuitive situation, you really need specific concrete allegations to establish your injury. And the Supreme Court has also made clear in the Simon case that— How do you respond to their argument that saw that the district court prematurely dismissed a complaint, a sua sponte dismissal, without giving them the opportunity to respond or amend their complaint? So a few things. One, they didn't ask the district court for this. They didn't file a motion for reconsideration saying, hey, you dismissed a sua sponte. Please allow us to amend the complaint or conduct discovery or whatever it is they say they need to do. Two, they did not raise that in their opening brief as grounds for reversal. They waited until the reply brief to spring this on the court. So this argument is totally forfeited as a result of their own conduct. In addition, the cases that they rely on say that a district court should not dismiss sua sponte, a case on the merits. This was not a dismissal on the merits. This was not a 12B6 dismissal. This was a dismissal for lack of jurisdiction. And the cases that they cite don't deal with dismissals for lack of jurisdiction and, in fact, carve them out. And finally, I would just point out that this is like all dismissals for lack of standing without prejudice. If they believe that they could draft another complaint that satisfies Article III, they can refile their case, and there is nothing here that would prevent them from doing that. I've just got one question that's sort of how the program works. So under this public service loan forgiveness program, participants cannot obtain relief, as I understand it, until after they've made 120 payments. And so can the loans be forgiven early under the program, or do you still have to make the full 120 payments to 10 years? You mean even with the account? Even with the adjustment. Yes, so there still have to be 120 payments, and each payment has to be during a time of employment with a public service employer. So what the account adjustment does, this aspect of the account adjustment, there are other aspects that are not challenged, changes what's counted as a qualifying payment. It does not change the obligation that what counts as the payment has to have been made during employment with a qualifying public service employer. So it is not possible that someone could achieve forgiveness as a result of the account adjustment who has only worked for a public service employer for seven years. That cannot happen. They have to have all 120 months have to have occurred during employment with a qualifying employer. That's my question. Thank you. A question that goes maybe to the APA issue. I think your friend on the other side argues the aesthetic standing from the EPA context. Would that work here? No. They're talking about environmental law type cases where someone has suffered harm by being kind of prevented from enjoying an area or kind of receiving aesthetic benefits. That is an Article III injury, and that kind of Article III injury provides the basis for a procedural claim. They don't have an injury here. They're not saying they have an environmental type injury, and to the extent that they're trying to say, well, hiring someone, a participant in the public service loan forgiveness program is akin to going to a national park, I think there's a couple problems with that. I mean, one is they don't cite any cases for that. Two, they have these kind of someday aspirations. They don't have concrete plans to hire a public service loan forgiveness applicant at a specific time. Two, they can't tell a public service loan forgiveness program participant from any other applicant. As they acknowledge, they may not even know until the loans are forgiven, because some people may go through their whole 120 months and not kind of inform their employer that they're participating in the program until the end when they ask for other certifications. So they don't know one person from another. And third, they haven't alleged that there's anything kind of distinctive about these people. They don't allege, for example, that if they have two applicants, one of whom participates in PSLF and one of whom doesn't, that they can pay one of the applicants less than the other or that that's their current employment practice. You know, that when we hire people with student loans, we pay them $50,000 a year, and when we hire people without, we pay them $80,000 a year. They don't allege anything like that. So I think there's no basis for this, what I would say is a really remarkable leap, to say that we should extend kind of well-established environmental aesthetic type enjoyment injuries into this new context. So if there are no further questions, I'd ask that the judgment be affirmed. Thank you. Thank you. I want to start by addressing this issue of increased competition. In this circuit, increased competition, we agree, is what's needed for competitor standing. But in this circuit, under the Growth Alliance case, increased competition is demonstrated by a variety of means. It's not just when new entrants are entered into the market. It also exists when economic disadvantage is imposed. And that's what Growth Alliance says, and that's what – Can you respond to the argument that there was a Supreme Court case that sort of – Your Honor, that's the Nike case, I believe would already be Nike. In the Nike case, it had to do about a trademark infringement issue. And there, Nike entered into a consent agreement saying we'll never infringe, we'll never bring an infringement action against the plaintiff in that case. And under that circumstance, that trademark, even though it's a benefit to Nike in some sense, could not possibly be used to give a disadvantage to already the Nike competitor in that case. So again, the question is economic disadvantage. Already Nike had nothing to do with economic disadvantage. There was no economic disadvantage when there was a consent agreement that prevented an infringement suit from ever being brought. Already in that case could use the trademark at issue at the same – at any point, whatever they want. Because Nike – because of the consent agreement, there was no economic disadvantage. Here, the economic disadvantage is quite plain. The number of borrowers who are incentivized to work for public service employers is being reduced by – we actually don't know because they never announced it, but it could be up to 3.6 million or more. And to be sure, even though an employer may not know whether a particular borrower, a particular employee, a particular hire is participating in the program, the borrower certainly knows. And when an employer – the employer doesn't have to discriminate based on paycheck. In fact, the employer can say we offer $60,000 for a particular job, and a participant will hear that $60,000 and look at their student loan and say, yeah, to me that $60,000 is actually worth $70,000 because of the student loans I have at issue. And therefore, I'm more likely to take this job. And even though this incentive clearly operates on third parties, borrowers as my friend provides, we know that the predictable effects on third parties under the Department of Commerce case is sufficient for standing. And here, the predictable effects of basically increasing someone's pay is to incentivize them to take a particular job. And of course, you take that away, you're disincentivizing them from taking that job. And that disincentive is an economic disadvantage sufficient for competitive standing under this court-binding precedent. It is also an economic interest. Public service employers have a concrete economic interest in a congressional program that provides financial incentives for borrowers to work for public service employers. And any diminution to that program's incentives without notice of comment is also a procedural injury, Your Honors. We ask that you reverse and remand for further proceedings. Thank you. Thank you.